Teresa GAROFOLO, Appellant,

v.

OCWEN LOAN SERVICING,
L.L.C., Appellee

NO. 15–0437

Supreme Court of Texas.

Argued September 23, 2015

Opinion Delivered: May 20, 2016

Rehearing Denied September 23, 2016

Scott R. Kidd, Kidd Law Firm, Austin TX, for Appellant.

Benjamin David Lee Foster, Locke Lord LLP, Austin TX, Daron L. Janis, Robert T. Mowrey, William Scott Hastings, Locke Lord LLP, Dallas TX, Sahar Shirazi, Kari Lynn Robinson, Baker Donelson Bearman Caldwell & Berkowitz, P.C., Houston TX, for Appellee

B. Scott Daugherty, Texas Bankers Association, Austin TX, John C. Fleming, Law Office of John C. Fleming, Austin TX, Karen Sue Neeley, Kennedy Sutherland LLP, Austin TX, for Amicus Curiae parties.

JUSTICE BROWN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

The Texas Constitution allows a home-equity lender to foreclose on a homestead only if the underlying loan includes specific terms and conditions. Among them is a requirement that a lender deliver a release of lien to the borrower after a loan is paid off. Another is that lenders that fail to meet their loan obligations may forfeit all principal and interest payments received from the borrower. In this case, a borrower sued her home-equity lender in federal court seeking forfeiture after her lender failed to deliver a release of lien. The borrower appealed the district court's dismissal of her claims, and we accepted two certified questions from the United States Court of Appeals for the Fifth Circuit asking if we find a constitutional right to forfeiture or, alternatively, if forfeiture is available through a breach-of-contract action under these facts.

We answer "no" to both questions. Our constitution lays out the terms and conditions a home-equity loan must include if the lender wishes to foreclose on a homestead following borrower default. It does not, however, create a constitutional cause of action or remedy for a lender's subsequent breach of those terms or conditions. A post-origination breach of those terms and conditions may give rise to a breach-of-contract claim for which forfeiture can sometimes be an appropriate remedy. But when forfeiture is unavailable, as in this case, the borrower must show actual damages or seek some other remedy such as specific performance to maintain her suit.

**I**

In 2010, Teresa Garofolo took out a $159,700 home-equity loan with Ally Bank.

She made timely monthly payments and paid off the loan on April 1, 2014, at which time Ocwen had become the note's holder. A release of lien was recorded in Travis County on April 28, but Garofolo did not receive a release of lien in recordable form as required by her loan's terms. Garofolo notified Ocwen she had not received the document. Upon passage of 60 days following that notification, and still without the release, Garofolo sued Ocwen in federal district court for violating home-equity lending provisions of the Texas Constitution and breach of contract. For both claims, Garofolo sought Ocwen's forfeiture of all principal and interest she paid on the loan.

Both the release-of-lien [1] and forfeiture [2] provisions of Garofolo's loan are among the terms and conditions the Texas Constitution requires of foreclosure-eligible home-equity loans. Garofolo therefore argues that Ocwen's failure to deliver the release of lien amounted to a constitutional violation for which a constitutional forfeiture remedy is appropriate. And because the release-of-lien and forfeiture provisions were incorporated into Garofolo's loan, she alternatively argues forfeiture is a remedy available through her breach-of-contract action. Because her constitutional claim "raises an important issue of Texas constitutional law as to which there is no controlling Texas Supreme Court authority, and the authority from the intermediate state appellate courts provides insufficient guidance," [3] we accepted the following two certified questions from the Fifth Circuit [4]:

(1) Does a lender or holder violate Article XVI, Section 50(a)(6)(Q)(vii) of the Texas Constitution, becoming liable for forfeiture of principal and interest, when the loan agreement incorporates the protections of Section 50(a)(6)(Q)(vii), but the lender or holder fails to return the cancelled note and release of lien upon full payment of the note and within 60 days after the borrower informs the lender or holder of the failure to comply?

(2) If the answer to Question 1 is "no," then, in the absence of actual damages, does a lender or holder become liable for forfeiture of principal and interest under a breach of contract theory when the loan agreement incorporates the protections of Section 50(a)(6)(Q)(vii), but the lender or holder, although filing a release of lien in the deed records, fails to return the cancelled note and release of lien upon full payment of the note and within 60 days after the borrower informs the lender or holder of the failure to comply?

## II

In the first certified question, we are asked if Ocwen's failure to deliver a release of lien amounts to a constitutional violation for which a constitutional forfei-

1. The constitution allows foreclosure on a homestead only if a home-equity loan is made "on the condition that ... within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit." TEX. CONST. art. XVI, § 50(a)(6)(Q)(vii).

2. The forfeiture provision provides that "the lender or any holder of the note for the exten-

sion of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit." TEX. CONST. art. XVI, § 50(a)(6)(Q)(x).

3. *Garofolo v. Ocwen Loan Servicing, L.L.C.,* 626 Fed.Appx. 59, 60 (5th Cir.2015) (per curiam).

4. *See id.* at 66.

ture remedy applies. If we answer "yes," the myriad terms and conditions required for a home-equity loan to be foreclosure-eligible would amount to substantive constitutional rights and obligations. As such, a lender's failure to honor them would give rise to not just a breach-of-contract claim, but a violation of the constitution itself. Our constitution's plain language, however, compels us to answer "no."

We strive to give constitutional provisions the effect their makers and adopters intended. *See Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 355 (Tex.2000). Accordingly, when interpreting our state constitution, we rely heavily on its literal text and give effect to its plain language. *See Republican Party of Tex. v. Dietz*, 940 S.W.3d 86, 89 (Tex.1997). We presume the constitution's language was carefully selected, and we interpret words as they are generally understood. *See Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009). And we construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments and provisions in light of each other. *See Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 344 (Tex. 2001).

In Texas, "the homestead has always been protected from forced sale, not merely by statute as in most states, but by the Constitution." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 570 (Tex.2013) (citing Tex. Const. art. VII, § 22 (1845); Tex. Const. art. VII, § 22 (1861); Tex. Const. art. VII, § 22 (1866); Tex. Const. art. XII, § 15 (1869); Tex. Const. art. XVI, § 50 (1876)). Even during Texas' days as a republic, statutory provisions conferred protected status on the homestead. *Id.* at 570 n. 8. (citing Act approved Jan. 26, 1839, 3d Cong., R.S., 1839 Repub. Tex. Laws 125, 125–26, *reprinted in 2 H.P.N.*

*Gammel, The Laws of Texas 1822–1897* at 125, 125–26 (Austin, Gammel Book Co. 1898)). The 1869 and 1876 constitutions allowed just three exceptions to Texas' policy of freedom from forced sale of a homestead, but more have been added by constitutional amendments. *See id.* at 570–71. It was only in 1997 that Texas created exceptions for reverse mortgages and home-equity loans. *Id.* at 571 (citing Tex. H.R.J. Res. 31, 75th Leg., R.S., 1997 Tex. Gen. Laws 6739 (adopted at the general election on Nov. 4, 1997, by a vote of 698,870 to 474,443)).

Today, section 50 of the constitution protects the homestead from foreclosure for the payment of debts subject to eight exceptions, one of which covers only those home-equity loans that contain a litany of exacting terms and conditions set forth in the constitution. *See* Tex. Const. art. XVI, § 50(a)(6)(A)–(Q). When reduced to the language relevant to this case, section 50(a) reads:

> The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for ... (6) an extension of credit that ... (Q) is made on the condition that ... (vii) within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit....
>
> ...
>
> (x) [E]xcept as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if

the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply...."

Our initial inquiry is whether these terms and conditions amount to substantive constitutional rights and obligations. In concluding they do not, we first observe that section 50(a) does not directly create, allow, or regulate home-equity lending. Nowhere does it say all home-equity loans must include the constitutional terms and conditions, nor does it prohibit loans made on other terms. It simply describes what a home-equity loan must look like if a lender wants the option to foreclose on a homestead upon borrower default.

As to constitutional rights, section 50(a) creates but one: freedom from forced sale to satisfy debts other than those described in its exceptions. The delineation of home-equity lending terms and conditions serves only to set the boundaries of that constitutional right. The relevance of those terms and conditions is therefore contingent on the fundamental guarantee of section 50(a)—that the homestead is protected from forced sale "except for [a home-equity loan] that" includes the terms outlined in section 50(a)(6)(A)–(P) and "is made on the condition that" it also include the provisions set forth in section 50(a)(6)(Q)(i)–(xi). Those terms and conditions are not constitutional rights and obligations unto themselves. They only assume constitutional significance when their absence in a loan's terms is used as a shield from foreclosure.[5]

Section 50(a) therefore does not constitutionally guarantee a lender's post-origination performance of a loan's terms and conditions. From a constitutional perspective, compliance is measured by the loan as it exists at origination and whether it includes the terms and conditions required to be foreclosure-eligible. *See Sims v. Carrington Mortg. Servs., L.L.C.,* 440 S.W.3d 10, 17 n. 28 (Tex.2014) ("[N]othing in Section 50 suggests that a loan's compliance is to be determined at any time other than when it is made."). A lender that includes the terms and conditions in the loan at origination but subsequently fails to honor them might have broken its word, but it has not violated the constitution. This is not to say the constitution is unconcerned with a lender's post-origination performance of the loan's terms and conditions. On the contrary, the constitution prescribes a harsh remedy through forfeiture, a remedy we previously have called "Draconian." *See Norwood,* 418 S.W.3d at 572.[6] But just as the terms and conditions

---

**5.** Garofolo argues we have previously characterized section 50(a)(6) as containing "substantive rights and obligations." *See Stringer,* 23 S.W.3d at 356. At issue in *Stringer* were conflicting provisions in section 50(a)(6)(Q)(i) and section 50(g)(Q), a mandatory-notice provision setting forth verbatim text to be given to prospective borrowers. We held the terms and conditions proscribed by section 50(a)(6) controlled over the mandatory-notice language in section 50(g)(Q), a conflict we supposed was a drafting oversight. *See id.* Our characterization of section 50(a)(6)(Q)(i) as containing "substantive rights and obligations" was appropriate in *Stringer* for the sake of comparison to a non-substantive man-

datory-notice provision, but the characterization does not carry over to a case in which it is argued section 50(a)(6) creates stand-alone constitutional causes of action for each term and condition listed. Moreover, we said "section 50(a)(6) *and the loan documents themselves* provide the substantive rights and obligations of the lenders and borrowers." *Id.* at 357 (emphasis added). The language employed in *Stringer* was not precisely tuned to the posture of this case, and it certainly is not dispositive of the question presented here.

**6.** Garofolo argues our previous characterization of the forfeiture remedy as "Draconian" militates against the interpretation we adopt

in section 50(a)(6) are not constitutional rights unto themselves, nor is the forfeiture remedy a constitutional remedy unto itself. Rather, it is just one of the terms and conditions a home-equity loan must include to be foreclosure-eligible.

If Ocwen sought to foreclose on Garofolo's homestead after she became delinquent in her payments, she could stand on the constitutional right to freedom from forced sale if her loan failed to include the release-of-lien requirement or forfeiture remedy. But that did not happen. Garofolo made timely payments and satisfied the balance in full. Ocwen never sought to foreclose, and there is no constitutional violation or remedy for failure to deliver a release of lien. Section 50(a) simply has no applicability outside foreclosure.

Garofolo argues this interpretation nullifies the constitution's intent to impose stiff punishment on lenders. She insists that under our reading lenders could recite the constitutionally required terms but violate them with impunity. But borrowers are not without recourse when a lender fails to meet its obligations, they are just without *constitutional* recourse. *See Wells Fargo Bank, N.A. v. Robinson,* 391 S.W.3d 590, 595 (Tex.App.–Dallas 2012, no pet.) ("A borrower's recourse for a lender's failure to abide by the terms of his loan agreement is to assert traditional tort and breach[-]of[-]contract causes of action, not

constitutionally mandated forfeiture."). The constitution prohibits foreclosure when a home-equity loan fails to include a constitutionally mandated term or condition, but it does not address post-origination enforcement of a loan's provisions. Accordingly, we answer "no" to the first certified question.

## III

The second certified question asks if Garofolo can seek forfeiture through her breach-of-contract claim absent actual damages. Under these facts, we answer "no." Although the forfeiture remedy incorporated into Garofolo's loan might be applicable to a lender's failure to comply with some of her loan's terms, it does not apply to a failure to deliver a release of lien. Accordingly, Garofolo must show actual damages to maintain her breach-of-contract claim or seek some other remedy, such as specific performance.

In bringing a breach-of-contract claim, Garofolo has pleaded an appropriate cause of action for relief from a lender's post-origination failure to honor the terms and conditions, constitutionally mandated or not, of a home-equity loan. Her loan incorporates both constitutional provisions at issue in this case: the requirement to deliver a release of lien and the forfeiture remedy.[7] Garofolo acknowledges she has

---

here. But our previous characterization is not a comment on the remedy's applicability and says nothing as to whether it is a constitutional remedy.

7. The loan agreement is not included in the record sent to this Court. However, in its unpublished opinion certifying the two questions in this case, the Fifth Circuit quotes from the Security Agreement, including the requirement that "[w]ithin a reasonable time after termination and full payment of the Extension of Credit, Lender shall cancel and return the Note to the owner of the Property and give the owner … a release of the lien,"

see *Garofolo,* 626 Fed.Appx. at 60 (alterations in original), as well as Section 19 of the Security Agreement, *id.* at 65 n. 6, which states:

All agreements between Lender and Borrower are hereby expressly limited so that in no event shall any agreement between Lender and Borrower or between either of them and any third party, be construed not to allow Lender 60 days after receipt of notice to comply as provided in this Section 19, with Lender's obligations under the Extension of Credit to the full extent permitted by Section 50(a)(6), Article XVI of the Texas

not suffered any damages from Ocwen's failure to deliver the release but argues she need not suffer any to access a contracted-for forfeiture remedy that is not contingent on proof of actual damages.

We assume, as the Fifth Circuit did for purposes of reviewing the trial court's motion to dismiss, that (1) Ocwen failed to give Garofolo a release of lien as required by the loan's terms; (2) Garofolo informed Ocwen of the deficiency; and (3) Ocwen was allowed 60 days after notice to deliver the document before Garofolo sued. *See Garofolo*, 626 Fed.Appx. at 60. The issue is whether the contractual forfeiture remedy applies under these assumed facts.

Garofolo's loan provides that after the required 60–day notice of a failure to comply with the loan's terms, and "only after [the] lender has [still] failed to comply, shall all principal and interest be forfeited by Lender, as required by Section 50(a)(6)(Q)(x), Article XVI of the Texas Constitution in connection with failure by Lender to comply with its obligations under the Extension of Credit." Because the contractual forfeiture provision incorporates by reference the constitutional forfeiture provision, we are again presented with a question of constitutional interpretation.

Section 50(a)(6)(Q)(x) provides:

[E]xcept as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lend-

er or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:

(a) paying the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b) sending the owner a written acknowledgment that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c) sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d) delivering the required documents to the borrower if the lender fails to

Constitution. Borrower understands that the Extension of Credit is being made on the condition that Lender shall have 60 days after receipt of notice to comply with the provisions of Section 50(a)(6), Article XVI of the Texas Constitution. As a precondition to taking any action premised on failure of lender to comply, Borrower will advise Lender of the noncompliance by a notice given as required by Section 14, and

will give Lender 60 days after such notice has been received by Lender to comply. Except as otherwise required by Applicable law, only after lender has failed to comply, shall all principal and interest be forfeited by Lender, as required by Section 50(a)(6)(Q)(x), Article XVI of the Texas Constitution in connection with failure by Lender to comply with its obligations under the Extension of Credit....

comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgment, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f) if the failure to comply cannot be cured under Subparagraphs (x)(a)-(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section . . . .

The unquestionably harsh forfeiture penalty is triggered when, following adequate notice, a lender fails to *correct* the complained-of deficiency *by* performing one of six available corrective measures. Ocwen argues forfeiture is simply inapplicable here because none of the six corrective measures addresses the failure to deliver a release of lien. Therefore, Ocwen could perform any or all of them yet still not *correct* the underlying deficiency. Garofolo argues, however, that performance of the catch-all remedy in subparagraph (f)— a $1,000 refund and an offer to refinance her loan—would have corrected the deficiency because Ocwen would have performed one of the measures required to avoid forfeiture. Of course, there was nothing to refinance—Garofolo had already paid off her loan—and a $1,000 payment would not buy her a document only Ocwen can provide. Nonetheless, Garofolo maintains that performance of subparagraph (f) was necessary to avoid forfeiture even if it completely fails to remedy or even address Garofolo's actual complaint.

The obvious intent behind the forfeiture remedy as a whole is to encourage lenders to correct loan infirmities under the threat of the stiff punishment of forfeiture. *Cf. Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344, 348 (Tex.1979) (cited in ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 63 (2012)). Allowing lenders to avoid punishment by performing an irrelevant corrective measure at the expense of directly addressing the borrower's complaint frustrates this intent. It follows that the six specific corrective measures exist to give lenders avenues to avoid forfeiture by fixing problems rather than furnishing technicalities that can be manipulated to avoid them. *See Dir. of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 267 (Tex.1980) (quoting *Markowsky v. Newman*, 134 Tex. 440, 136 S.W.2d 808, 813 (1940) (when construing the constitution, it is appropriate to consider "the evils intended to be remedied" and "the good to be accomplished").

Nonetheless, the parties ultimately differ on what a lender must do to "correct" its failure to comply with the loan's terms. *See* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x) (forfeiture applies when a lender "fails to *correct* the failure to comply" (emphasis added)). Does a lender "correct" simply by performing one of the six corrective measures even if none addresses the borrower's complaint? Or does a lender "correct" by actually fixing the problem of

which the borrower complains? Common usage of the word and common sense suggests the latter. *See Harris Cty. Hosp. Dist.*, 283 S.W.3d at 842 (When construing the constitution, "we interpret words as they are generally understood."). To "correct" means "to make or set right" or "remove the faults or errors from." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 511 (2002). Under this definition, performance of an irrelevant corrective measure in wilful blindness to whether it addresses the borrower's complaint can hardly be said to "correct" anything.

Moreover, the constitution invokes forfeiture when a lender "fails to correct *the failure to comply*." *See* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). The "failure to comply" is a reference to the lender's original transgression: its "fail[ure] to comply with the lender's or holder's obligations under the extension of credit." *Id.* Again, the constitution insists not on technical compliance with a corrective measure but on actually fixing the problem. Ocwen can correct its "failure to comply" by delivering a release of lien, but not by writing a $1,000 check and offering to refinance a nonexistent loan. Garofolo's argument that the constitution technically requires Ocwen to perform an irrelevant corrective measure instead of addressing her actual complaint necessarily reads "the failure to comply" out of the constitution.

The six corrective measures each present an avenue through which a lender might actually correct a deficiency. But as this case demonstrates, these corrective measures do not speak to every manifestation of a lender's failure to comply with its obligations. Accordingly, a lender might actually correct a deficiency but fail to do so through performance of a corrective measure. For example, if Ocwen delivered Garofolo's release of lien within 60 days following notice, it would have actually corrected its failure to comply but would not have done so "by" performance of a constitutionally specified corrective measure. *See id.* Should it suffer forfeiture? Garofolo argues it should, but this view ignores that forfeiture is available only when a lender fails to correct its "failure to comply *by* " performance of a specific corrective measure. *See id.* (emphasis added). If none of those measures actually correct the lender's failure to meet its obligations, the lender cannot correct its failure to comply "by" performing one of them, and therefore forfeiture is simply unavailable. *See id.* (a lender "shall forfeit all principal and interest ... *if* the lender or holder fails to comply with the lender's or holder's obligations ... and fails to correct the failure to comply ... *by* " performing a corrective measure (emphasis added)). Accordingly, if a lender fails to meet its obligations under the loan, forfeiture is an available remedy only if one of the six corrective measures can actually correct the underlying problem and the lender nonetheless fails to timely perform the relevant corrective measure.

The constitutional evolution of the forfeiture remedy informs this reading.[8] *See Doody*, 49 S.W.3d at 344 ("We construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments

---

8. Garofolo argues legislative history shows that "[t]he intent of the makers and adopters of this amendment also supports forfeiture for failure to cancel and return the note." But the history she points us to concerns only the 1997 amendment, not the 2003 amendment that limited the forfeiture remedy's applica-tion. Regardless, it is unnecessary to refer to any legislative history in this case. Section 50(a)(6)(Q)(x) is clear, and when text is clear, it is determinative. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

and provisions in light of each other."). When first enacted in 1997, the forfeiture provision did not contain *any* corrective measures. It read:

> [T]he lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit within a reasonable time after the lender or holder is notified by the borrower of the lender's failure to comply.

Tex. Const. art. XVI, § 50(a)(6)(Q)(x) (amended 2003).

Under the original provision, a lender's "failure to comply" with its "obligations under the extension of credit" arguably invoked forfeiture for any transgression, no matter how slight. However, a constitutional amendment passed in 2003 made three significant changes that clarified the forfeiture remedy's applicability. First, a 60-day window to cure following notice was adopted, replacing the amorphous "within a reasonable time" standard. Second, six corrective measures were adopted where before there were none. Third, whereas forfeiture under the original version was arguably triggered whenever a lender "fails to comply with [its] obligations," the current version does not implicate forfeiture until a lender "fails to correct the failure to comply ... by" performance of a corrective measure.

Read together, these changes plainly were intended not to obfuscate but to clarify—and limit—the forfeiture remedy. Considering the original provision arguably implicated forfeiture for any deficiency, the addition of six specific corrective measures is most reasonably understood to bookend the remedy's applicability. To argue otherwise—that forfeiture remains available for lender noncompliance unaddressed by the six corrective measures—

assumes the amendment added a great many words, primarily in describing the six corrective measures, with no practical alteration of the arguably open-ended original forfeiture provision. *See Stringer*, 23 S.W.3d at 355 ("We strive to give constitutional provisions the effect their makers and adopters intended" while "avoid[ing] a construction that renders any provision meaningless or inoperative."). Furthermore, if the corrective measures do not limit the remedy's applicability, then they necessarily create an avenue for lenders to avoid rather than address borrowers' complaints; lenders may avoid addressing a borrower's actual complaint if it is easier to simply perform an irrelevant corrective measure. We cannot fathom constitutional intent for this result and find no language compelling it.

Garofolo argues, however, that at a bare minimum Ocwen was required to perform the catchall corrective measure found in subparagraph (f), which applies "if the failure to comply cannot be cured under Subparagraphs (x)(a)–(e) of this paragraph." And it is undisputed that none of the other corrective measures addresses Garofolo's complaint. Undoubtedly, in the vast majority of cases this catch-all provision will present a fix that will actually correct the borrower's complaint when no other corrective measure would. But subparagraph (f) cannot apply to *every* deficiency not addressed by the other five corrective measures because the forfeiture provision still assumes performance will actually correct the underlying complaint. And even the catch-all provision assumes a loan still in existence. *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(x)(f) (a lender must offer to refinance "for the remaining term of the loan"). It further assumes a refinanced loan on different terms would repair the underlying deficiency. *See id.* ("[I]f the failure to comply cannot be cured under

Subparagraphs (x)(a)–(e), *cur[e]* the failure to comply by a refund ... and offer the owner the right to refinance ...." (emphasis added)). Here, offering to refinance a paid-off loan is ridiculously futile, and paying Garofolo a $1,000 refund likewise does nothing to provide her with a release of lien.[9] Accordingly, performance under subparagraph (f) does not actually correct Ocwen's failure to deliver Garofolo's release of lien by performance of one of the six corrective measures, and forfeiture is therefore an unavailable remedy under these facts.[10] Again, we do not suggest Garofolo is without recourse. Her remedy simply lies elsewhere—for instance, in a traditional breach-of-contract claim, in which a borrower seeks specific performance or other remedies contingent on a showing of actual damages.

\* \* \*

 The terms and conditions required to be included in a foreclosure-eligible home-equity loan are not substantive constitutional rights, nor does a constitutional forfeiture remedy exist to enforce them. The constitution guarantees freedom from forced sale of a homestead to satisfy the debt on a home-equity loan that does not include the required terms and provisions—nothing more. Ocwen therefore did not violate the constitution through its post-origination failure to deliver a release of lien to Garofolo. A borrower may seek forfeiture through a breach-of-contract claim when the constitutional forfeiture provision is incorporated into the terms of a home-equity loan, but forfeiture is available only if one of the six specific constitutional corrective measures would actually correct the lender's failure to comply with its obligations under the terms of the loan, and the lender nonetheless fails to timely perform the corrective measure following proper notice from the borrower. If performance of none of the corrective measures would actually correct the underlying deficiency, forfeiture is unavailable to remedy a lender's failure to comply with the loan obligation at issue. Accordingly, we answer "no" to both certified questions.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON joined.

Justice Boyd, joined by Justice Johnson, dissenting in part.

I do not agree with the Court's answer to the Fifth Circuit's second question, and instead conclude that the parties' agreement expressly gives the borrower a contractual right to forfeiture of all principal and interest paid upon the lender's "failure to correct [a] failure to comply" with its obligations under the loan. Though the Court is concerned about such a "harsh forfeiture remedy," *ante* at 478, it is the

---

9. The $1,000–refund component of subparagraph (f) is best interpreted as a liquidated-damages provision inextricably tied to the offer to refinance. Accordingly, the determination of whether subparagraph (f) would actually correct the lender's failure to comply with its obligations under the loan typically will turn solely on the corrective capacity of the offer to refinance.

10. In *Vincent v. Bank of America, N.A.,* the Dallas court of appeals held that "[a]s long as the Loan Agreement, as originally entered into by the parties, complies with the provi-

sions of the constitution, forfeiture is not an appropriate remedy." 109 S.W.3d 856, 862 (Tex.App.–Dallas 2003, pet. denied). But as we clarify today, whether a loan complies with the constitution answers only the question of whether the lender may seek a forced sale of the homestead. A forfeiture remedy incorporated into the terms of a loan and enforced through a breach-of-contract action may, under circumstances not presented in this case, impose forfeiture in response to a lender's post-origination breach of the loan's terms.

remedy the text requires and to which both parties agreed. To reach the opposite conclusion, the Court adds words to the parties' contract and to the Constitution's language, and rewrites both to achieve the result it believes "common sense suggests." Although the Court's result may comport with "common sense," or at least with the Court's view of "common sense," it is not what the parties agreed to or what the Constitution requires. I therefore respectfully dissent in part.[1]

## I.

### Contractual Forfeiture

The relevant constitutional language protects a homestead from foreclosure "for the payment of all debts except for . . . an extension of credit that . . . is made on" certain specified conditions. TEX. CONST. art. XVI, § 50(a)(6)(Q). One condition is that the lender must give the borrower a recordable release of lien within a reasonable time after the borrower pays off the note. *Id.* art. XVI, § 50(a)(6)(Q)(vii). Another is that the lender or holder of the note "shall forfeit all principal and interest . . . if the lender or holder fails to comply with [its] obligations . . . and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified . . . of the lender's failure to comply by":

(a) paying to the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b) sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c) sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d) delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f) if the failure to comply cannot be cured under Subparagraphs (x)(a)–(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the

1. In answer to the Fifth Circuit's first certified question, the Court concludes that article 16, section 50(a)(6) of the Texas Constitution does not create a *constitutional* right to contractual performance or a *constitutional* remedy for a contractual breach. I agree, for the reasons the Court explains, and I join that portion of the Court's opinion.

**486**

extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section. . . .

*Id.* § 50(a)(6)(Q)(x).

Consistent with the first required condition, the lender and borrower in this case agreed to a security instrument that requires the lender to give the borrower a recordable release of lien within a reasonable time after termination and full payment of the loan. *Ante* at 485. And consistent with the second condition, the agreement requires the borrower to give the lender notice of the lender's failure to comply with an obligation, allows the lender "60 days after receipt of notice to comply with the provisions of Section 50(a)(6)," and provides that "only after lender has failed to comply, shall all principal and interest be forfeited by Lender, as required by Section 50(a)(6)(Q)(x), Article XVI of the Texas Constitution in connection with failure by Lender to comply with its obligations." *See ante* at 480 n. 7.

For purposes of this appeal from the dismissal of the borrower's claims under federal rule 12(b)(6), we must accept as true the borrower's allegations that: (1) the holder failed to comply with its obligations under the loan by failing to give the borrower a recordable release of lien within a reasonable time after the borrower paid off the note; (2) the borrower gave the holder proper notice of its failure to comply with that obligation; and (3) within 60 days after receiving that notice, the holder did not "correct the failure to comply" by taking any of the actions listed in section 50(a)(6)(Q)(x)(a)–(f). *Ante* at 483. The Fifth Circuit's second question asks

whether, under these facts, the security instrument requires the lender to forfeit all principle and interest. Or, to use the security instrument's own language, "shall all principal and interest be forfeited by Lender, as required by Section 50(a)(6)(Q)(x), Article XVI of the Texas Constitution in connection with failure by lender to comply with its obligations?"

The Court concludes that the security instrument does not require the holder to forfeit all principal and interest unless one or more of the six corrective measures listed in subsections (a)–(f) of section 50(a)(6)(Q)(x) would "actually correct the lender's failure to meet its obligations." *Ante* at 482. The Court then concludes that the corrective measure in subsection (f), on which the borrower relies, would not have "actually corrected" the holder's failure to deliver the release of lien, and it would therefore be "ridiculously futile" and "irrelevant" for the holder to perform subsection (f)'s requirements. *Ante* at 484. Because the security agreement only permits forfeiture "as required by Section 50(a)(6)(Q)(x)," the Court concludes that forfeiture is not available here. *Ante* at 480. I disagree for four separate reasons: (1) subsection (f) expressly provides that it applies if the corrective measures in subsections (a)–(e) will not cure the holder's breach, so it must apply here; (2) subsection (f) "corrects" the underlying deficiency for purposes of avoiding forfeiture and motivates the holder to timely deliver the release of lien; (3) it is not "ridiculously futile" or "irrelevant" for the holder to perform the actions subsection (f) requires; and (4) even if the holder could not "correct" its breach by performing subsection (f)'s requirements, the agreement would expressly require forfeiture, not excuse it.

**A. Subsection (f) is a "catch-all" provision.**

Section 50(a)(6)(Q)(x) requires a holder to forfeit all principal and interest if the

holder "fails to comply" with an obligation and, in response to a notice of breach, the holder fails to "correct the failure to comply ... by" taking the steps described in one of its six subsections. TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)(a)–(f). The last of those six subsections—subsection (f)—expressly and specifically applies "if the failure to comply cannot be cured under" subsections (a)–(e). *Id.* § 50(a)(6)(Q)(x)(f). As the Court notes, subsection (f) is thus a "catch-all provision." *Ante* at 483. By its express terms, it applies whenever the other corrective measures would not cure the holder's failure to comply with one or more of its constitutionally authorized obligations, which includes the obligation to provide a release of lien. As a catch-all provision, it "acts as a safety net" by providing the holder a means to "correct [a] failure to comply," and thereby avoid forfeiture, when none of the other means will do. *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that the " 'catchall' provisions" in section 502(a) of the federal Employee Retirement Income Security Act "act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"). If a holder cannot avoid forfeiture by curing its breach under subsections (a)–(e), subsection (f) provides the holder a safety net to avoid forfeiture.

Based on its plain language, subsection (f) is a catch-all provision that, *for purposes of avoiding forfeiture*, in fact catches all. When "the failure to comply cannot be cured" by performing the acts that subsections (a)–(e) require, then performing the acts that subsection (f) requires will, by definition, "correct the failure to comply" for purposes of avoiding forfeiture. Because subsection (f) is a catch-all provision, there is no failure to comply that cannot be corrected *as a means to avoid forfeiture*. I disagree with the Court's

conclusion that the catch-all provision "cannot apply to *every* deficiency not addressed by the other five corrective measures," *ante* at 483, because that conclusion ignores subsection (f)'s express instruction that it applies if subsections (a)–(e) cannot cure the failure to comply.

## B. Subsection (f) "corrects" the deficiency.

Despite the Constitution's plain language that provides a holder can correct its failure under subsection (f) if subsections (a)–(e) will not "cure" the failure to comply, TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)(f), the Court concludes that subsection (f) does not apply when a holder fails to deliver a release of lien because the steps described in subsection (f) will not "*actually* correct" the failure to comply. *Ante* at 486 (emphasis added). But section 50(a)(6)(Q)(x) simply does not say that the corrective measures apply only when they "actually correct" a failure to comply. The text plainly says that—for purposes of avoiding forfeiture—the lender can "correct" the failure to comply "by" performing one of the six corrective measures, and that subsection (f) applies when subsections (a)–(e) would not "cure" the failure to comply. TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)(f). The Court confuses the text's distinct uses of the terms "correct" and "cure," and rewrites the text by adding the word "actually" when the text does not use that word at all.

Section 50(a)(6)(Q)(x) expressly describes how a lender can "correct" a failure to comply for purposes of avoiding forfeiture: the lender can "correct the failure to comply ... *by* " performing one of the six corrective measures. TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). The Court concludes that the six corrective measures "do not speak to every manifestation of a lender's failure to comply with its obligations,"

*ante* at 482, but because subsection (f) is a catch-all provision, we should not expect the list of corrective measures to specifically identify every possible failure to comply. "After all, the very purpose of a catch-all provision ... is to avoid the necessity of listing each matter ... falling within it." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 292, 131 S.Ct. 1101, 179 L.Ed.2d 37 (2011). Instead of listing every potential breach that subsections (a)–(e) do not address, subsection (f) permits the holder to "correct" all remaining deficiencies, for purposes of avoiding forfeiture, by refunding or crediting $1,000 to the borrower and offering to refinance the loan on fully compliant terms. TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)(f).

As the Court notes, " 'We strive to give constitutional provisions the effect their makers and adopters intended,' while 'avoid[ing] a construction that renders any provision meaningless or inoperative.' " *Ante* at 483 (quoting *Stringer v. Cendant Mortg. Co.*, 23 S.W.3d 353, 355 (Tex.2000)). But to "give effect to the plain intent and language of the framers of the amendments and of the people who adopted them," we must "begin[ ] with and giv[e] primacy to the language that was adopted." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex.2011). A plain reading of the adopted language reveals the framers' intent, but the Court rewrites this language to effectuate its own intent. The Court confuses the term "correct" with "cure," adds the word "actually," and renders inoperative the language that says subsection (f) applies if subsections (a)–(e) do not. The Court says "common sense *suggests* " its interpretation, *ante* at 482 (emphasis added), but our assessment of "common sense" does not permit us to ignore the adopted language. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 237 (2012) (noting that "judicial revision of ... texts to make them (in the judges' view) more reasonable" presents "a slippery slope").

Maybe we could ignore or "rewrite" the language if it produces an "absurd" result, but the Court does not rely on the absurdity doctrine here because that doctrine "is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex.2013). And "pointing out a quirky application is quite different from proving it was quite impossible that a rational Legislature could have intended it." *Id.* at 630–31. Perhaps applying the plain language of subsection (f) creates a less reasonable result than our "common sense" dictates, but even the Court does not contend that it produces an absurd result. *Id.* ("[T]he [absurdity] bar ... is high, and should be.").

## C. "Futility" and "Irrelevance"

Applying its common sense, the Court concludes that lenders and holders who fail to deliver a release of lien as promised should not have to comply with subsection (f) to avoid forfeiture because paying the borrower $1,000 and offering to refinance the note would be "ridiculously futile" and "irrelevant." *Ante* at 484. Instead, the Court believes the language should permit the holder to avoid forfeiture simply by delivering the release of lien. In fact, under the Court's construction, the lender can always avoid forfeiture when it fails to deliver a lien release, even by doing nothing at all, because the forfeiture remedy simply does not apply to a failure to deliver a release. *Ante* at 484. But this is not what the text says.

In any event, the holder's compliance with subsection (f) is not as futile or irrelevant as the Court suggests. While subsection (f) does not expressly or directly re-

quire the holder to "correct" or "cure" its failure to deliver the release of lien by actually delivering the release of lien, it serves to motivate the holder to avoid the failure in the first place, thus preventing the obligation to pay the borrower $1,000 and offer to refinance. Within sixty days of receiving notice that it has failed to deliver a release of lien, the holder must pay the borrower $1,000 and offer to refinance, or the holder is subject to forfeiture. If the holder pays the $1,000 and offers to refinance, but does not deliver the release of lien, it will avoid forfeiture but remain in breach of its obligation to deliver the release of lien.[2] Certainly, at that point, the borrower can sue for specific performance to obtain the release. Regardless, at a minimum, subsection (f) provides the holder a catch-all method to "correct" a failure to comply when the five other methods will not "cure" it, and by doing so motivates the holder to avoid the deficiency all together.

## D. The end result is forfeiture.

Finally, even if the holder's compliance with subsection (f) were futile, irrelevant, or otherwise inapplicable, the result under the plain language of the security instrument would be to *require* forfeiture, not excuse it. The Court asserts that, if the holder cannot actually correct its failure to comply "by" performing one of the six corrective measures, then "forfeiture is simply unavailable." *Ante* at 482. But it is the lender's failure to comply with its obligations that triggers the forfeiture remedy–not its failure to correct its failure to comply. Tex. Const. art. XVI, § 50(a)(6)(Q)(x). If the holder fails to comply with its obligations, the corrective measures give the holder an opportunity to

"correct the failure to comply" by performing the actions listed in one of the following subsections. *Id.* And if the holder does not correct its failure to comply "by" performing one of the listed corrective measures, the holder "shall forfeit all principal and interest." *Id.* If a holder that has breached its obligations and has received the borrower's notice of noncompliance does not or cannot timely perform one of the listed corrective measures, the result, according to the Constitution's plain language, is not that the forfeiture remedy is unavailable, but that the opportunity to *avoid* forfeiture is unavailable.

## III.

### Conclusion

The Court holds today that section 50(a)(6) of article XVI of the Texas Constitution does not create a constitutional right to contractual performance or a constitutional remedy for a contractual breach, and I agree. The Court also holds, however, that the constitutional provisions incorporated into the parties' contract do not give the borrower a contractual right to forfeiture of all principal and interest because those provisions do not "actually correct" the holder's breach and are "ridiculously futile" for the holder to perform. *Ante* at 484. But even if the parties' agreed remedy seems unfair or insufficiently sensible, our duty is to enforce the parties' agreement (and the Constitution's language) as written. Based on the Constitution's plain language, I disagree with the Court's second conclusion and, therefore, respectfully dissent in part.

---

**2.** Conversely, if the holder delivers the release of lien within 60 days of receiving the notice but does not pay the $1,000 and offer to refinance, it must forfeit all principal and

interest paid. Under subsection (f), the holder can only avoid forfeiture by paying the $1,000 and offering to refinance.