# IN THE SUPREME COURT OF TEXAS

═══════════

No. 19-0712

═══════════

FEDERAL HOME LOAN MORTGAGE CORPORATION, PETITIONER,

v.

SYLVIA ZEPEDA, RESPONDENT

═══════════════════════════════════════

ON CERTIFIED QUESTION FROM THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT

═══════════════════════════════════════

**Argued December 4, 2019**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The United States Court of Appeals for the Fifth Circuit has certified the following question

to this Court:

Is a lender entitled to equitable subrogation, where it failed to correct a curable
constitutional defect in the loan documents under § 50 of the Texas Constitution?[1]

We answer "yes".

---

[1] *Zepeda v. Fed. Home Loan Mortg. Corp.*, 935 F.3d 296, 301 (5th Cir. 2019). Article V, § 3-c(a) of the Texas Constitution gives this Court "jurisdiction to answer questions of state law certified from a federal appellate court." *See also* TEX. R. APP. P. 58 (governing certified questions).

# I

The facts of this case are straightforward. In 2007, Sylvia Zepeda obtained a loan from CIT Group/Consumer Finance, Inc. to buy her homestead and secured the loan using her homestead as collateral. Neither party disputes the validity of the lien created by that transaction.

In 2011, Zepeda refinanced her debt with a home-equity loan from Embrace Home Loans, Inc. She also used her homestead as collateral in that transaction. Embrace paid the balance of Zepeda's debt to CIT Group, which then released its claim on the homestead.

In 2015, Zepeda, through an attorney, notified Embrace by letter that the loan documents did not comply with Article XVI, § 50 of the Texas Constitution[2] because Embrace had not signed a form acknowledging the homestead's fair market value. The letter requested that Embrace cure the defect within 60 days, as required by § 50. In response, Embrace sent Zepeda another copy of the fair-market-value acknowledgment but failed to sign it. Embrace later sold the loan to the Federal Home Loan Mortgage Corp., better known as *Freddie Mac*.

Zepeda sent a letter to Freddie Mac notifying it of the constitutional defect and offering an opportunity to cure. Freddie Mac did not respond, and Zepeda sued to quiet title. Her theory is that because Freddie Mac failed to cure the constitutional defect in the loan documents within 60 days of notification, Freddie Mac does not possess a valid lien on her property. Freddie Mac claims that it is subrogated to CIT Group's 2007 lien because its predecessor Embrace paid off the balance of CIT Group's loan to Zepeda. Both parties moved for summary judgment.

---

[2] All references to § 50 are in Article XVI. For ease, we will reference the section number only.

The United States District Court for the Southern District of Texas granted Zepeda's motion and denied Freddie Mac's. The court concluded that Freddie Mac is not entitled to equitable—or common law—subrogation because it was negligent in failing to cure the constitutional defect in the Zepeda-Embrace loan documents. Freddie Mac appealed.[3]

After recounting the constitutional provisions and caselaw that govern homestead liens and subrogation in Texas, the Fifth Circuit observed that while this Court "has applied equitable subrogation in the face of a constitutionally-invalid home-equity loan" "[s]ince at least 1890," none of our decisions have "involve[d] a constitutional defect that is exclusively the fault of the lender, as is the case here."[4] "If the party seeking equitable subrogation could have satisfied the requirements of § 50(a)(6)(Q)(ix) but failed to do so, does that failure preclude it from invoking

---

[3] *Subrogation* means "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019). The doctrine arises in contexts besides the mortgage industry, such as insurance, *see, e.g.*, *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142–143 (Tex. 2008), and cases requiring the determination of priority among multiple liens, *see, e.g.*, *Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 519–520 (Tex. 1969). Subrogation that "arises by contract" has been called *conventional* or *contractual* subrogation, whereas subrogation that "arises by operation of law or by implication in equity" is known as *equitable* or *legal* subrogation." *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019).

The question certified is on the latter type. Freddie Mac also argued in federal court that it is contractually subrogated to CIT Group's lien by virtue of an express subrogation clause in the Embrace-Zepeda loan documents. The Fifth Circuit affirmed the district court's summary judgment for Zepeda on this issue. Quoting § 50(c)'s edict that "[n]o mortgage, trust deed, or other lien on the homestead shall ever be valid unless it" complies with all the requirements of § 50, the court reasoned that "[c]ontractual subrogation arises from a *valid* deed of trust", and the deed of trust held by Freddie Mac is invalid because it fails to comply with the fair-market-value-acknowledgment requirement of § 50(a)(6)(Q)(ix). *Zepeda*, 935 F.3d at 300–301. Freddie Mac argues here that this holding conflicts with our prior decisions, especially *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 662 (Tex. 1996), in which we held that the Bank was contractually subrogated to a federal tax lien even though the lien created by the Bank's deed of trust was constitutionally invalid. Although the Fifth Circuit "disclaim[ed] any intention or desire that [we] confine [our] reply to the precise form or scope of the question[] certified", *Zepeda*, 919 F.3d at 301–302, we decline to address the court's contractual-subrogation analysis.

[4] *Zepeda*, 935 F.3d at 301.

3

equitable subrogation?", the court asked.[5] The court interpreted our decisions as being silent and certified the question.[6]

## II

Texas law has always protected the homestead from forced sale.[7] "Even during Texas' days as a republic, statutory provisions conferred protected status on the homestead. The 1869 and 1876 constitutions allowed just three exceptions to Texas' policy of freedom from forced sale of a homestead, but more have been added by constitutional amendments."[8] Today, the general rule against liens on the homestead is in § 50(c): "No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section . . . ." Subsection (a) of § 50 enumerates the types of debt that may be secured by a lien on the homestead. The list has evolved over time. Zepeda's loan falls under § 50(a)(6), which was added to the Constitution in 1997 and authorizes home-equity loans that meet certain requirements.

In order for a lien created by a loan described by § 50(a)(6) to be eligible for foreclosure, the loan must meet "a litany of exacting terms and conditions."[9] The condition that Freddie Mac's loan failed here is in § 50(a)(6)(Q)(ix): The loan must be "made on the condition that" "the owner of the homestead *and the lender* sign a written acknowledgment as to the fair market value of the

---

[5] *Id.*

[6] *Id.*

[7] *Garofolo v. Ocwen Loan Servicing, L.L.C.*, 497 S.W.3d 474, 477 (Tex. 2016).

[8] *Id.* (citations omitted).

[9] *Garofolo*, 497 S.W.3d at 477. Subsection (a)(6) authorizes "an extension of credit" that meets requirements enumerated in paragraphs (A)–(Q). Some of those paragraphs have embedded requirements enumerated in subparagraphs (e.g., (a)(6)(E)(i)–(iv)) and sub-subparagraphs (e.g., (a)(6)(M)(iii)(a)–(b)).

4

homestead property on the date the extension of credit is made."[10] The lender has a 60-day window to cure its failure to sign the fair-market-value acknowledgment after being notified of the deficiency by the borrower; if the lender does not cure, it could be required to "forfeit all principal and interest" on the loan in an eventual foreclosure action.[11] Freddie Mac has not sought foreclosure and so the forfeiture remedy does not apply here.[12]

Common law subrogation has coexisted with this constitutional scheme for more than a century. In the mortgage context, the doctrine allows a lender who discharges a valid lien on the property of another to step into the prior lienholder's shoes and assume that lienholder's security interest in the property, even though the lender cannot foreclose on its own lien.[13] This Court has recognized the doctrine in the § 50 context since at least 1890.[14]

One of the earliest cases, *Texas Land & Loan Co. v. Blalock*, involved a culpable lender. There, Blalock executed a deed of trust on his land in exchange for an $800 loan. At the time, the Constitution prohibited any lien on a homestead except one securing either the homestead's purchase money or a loan to be used for improvements. The lender's loan to Blalock did not meet those criteria.

---

[10] Emphasis added.

[11] § 50(a)(6)(Q)(x)(d); *see Garofolo*, 497 S.W.3d at 479, 484 (explaining that "the forfeiture remedy [is not] a constitutional remedy unto itself" but may be enforced "through a breach-of-contract claim when the constitutional forfeiture provision is incorporated into the terms of a home-equity loan").

[12] *See Garofolo*, 497 S.W.3d at 479 ("Section 50(a) simply has no applicability outside foreclosure.").

[13] *See LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) (per curiam).

[14] *Oury v. Saunders*, 13 S.W. 1030, 1031 (Tex. 1890); *Tex. Land & Loan Co. v. Blalock*, 13 S.W. 12, 13–14 (Tex. 1890).

Blalock represented in both the loan application and the trust deed that the property was not his homestead. But when the lender later sought to foreclose, Blalock changed his tune. In fact Blalock and his family had been occupying the home continuously since before the loan application was made. We observed that "nothing was hidden. Possession was open, certain, and in character in no respect ambiguous. . . . [A]nd the lender cannot be heard to say that it did not know it."[15] But the lender had discharged a prior, purchase-money loan on the land. We held that "[u]nder this state of facts, the [lower] court did not err in subrogating [the lender] to all the rights held by the holder of the note given for purchase money, and in foreclosing the lien."[16] In sum, despite the lender's knowledge that its own lien was unconstitutional, the lender was still entitled to subrogation because it paid off the purchase-money loan encumbered by Blalock's property.

None of our subsequent § 50 decisions has considered any factor other than the lender's discharge of a prior, valid lien. To the contrary, in this context, we have said that a lender's right to subrogation is "fixed" when the prior, valid lien is discharged.[17]

---

[15] *Blalock*, 13 S.W. at 13.

[16] *Id.* at 13–14.

[17] *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 660 (Tex. 1996) (explaining that a constitutional amendment adopted after Crowder used the Bank's loan to pay off his federal tax debt had no bearing on the case because "the Bank's subrogation rights were fixed before the amendment's adoption"). Our lien-priority and insurance cases have employed different analyses. In the lien-priority context, we have said that "[n]egligence on the part of one seeking subrogation is of some importance when the right is wholly dependent upon equitable principles." *Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 519 (Tex. 1969). In that context, the negligence inquiry is focused on whether the party seeking subrogation had "actual or constructive [notice][] of an intervening lien". *Id.* In the insurance context, we have also required the party seeking subrogation to "show that the circumstances of the case favor equitable relief." *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 146 (Tex. 2008). In that context, the focus of the equity analysis is whether the debtor would be unjustly enriched if subrogation were denied. *See id.* at 146–147.

6

Zepeda acknowledges these decisions but argues that Texas voters eliminated subrogation in the 1990s by adopting specific amendments to § 50. She argues that the doctrine was developed in the late 19th century to circumvent the constitutional prohibition on homestead liens securing a refinance or home-equity loan. In 1995 and 1997, the voters approved amendments authorizing refinances (§ 50(a)(4)) and home-equity loans like Zepeda's (§ 50(a)(6), (f)–(g)), thus eliminating the historical justification for the doctrine. Zepeda also points to language in the 1997 amendments that, she claims, reveals the voters' intent that subrogation be abolished—specifically, § 50(a)(6)(Q)(x)'s mandate that a lender "forfeit all principal and interest" paid on the loan if the lender caused a constitutional defect in the loan documents and did not cure it within 60 days of receiving notice.

We rejected an indistinguishable argument in *LaSalle Bank National Association v. White*. *LaSalle* involved former § 50(a)(6)(I), now repealed, which prohibited home-equity loans secured by homestead property designated for agricultural use. Borrower White obtained a loan for $260,000 that was eventually assigned to LaSalle. The loan was secured by a lien against part of White's agricultural homestead property. At the time of disbursement, some of the $260,000 was used to pay off valid purchase-money and property-tax liens against the property. The rest was paid directly to White. White made a few payments but then stopped. When LaSalle sought to foreclose, White sought a declaration that LaSalle's lien violated the Constitution. The lower courts ruled for White. We reversed and expressly "disagree[d] [with the court of appeals] that the Constitution abrogates lenders' equitable subrogation rights under the common law."[18]

---

[18] 246 S.W.3d at 618.

White's argument was based on § 50(e), which was added to the Constitution in 1997. That section requires that a lien secured by a loan to refinance a homestead governed by § 50(a)(1)–(5) also meet the requirements of (a)(6) in order for the lien to be valid. LaSalle's lien on White's agricultural homestead did not. White argued, and the court of appeals agreed, that § 50(e) had implicitly "abrogate[d] all equitable subrogation rights, including those that arise from payment of constitutionally valid debts."[19]

Our rejection of that argument was clear: Section 50(e) "does not destroy the well-established principle of equitable subrogation."[20] It "contains no language that would indicate displacement of equitable common law remedies was intended, and we decline[d] to engraft such a prohibition onto the constitutional language."[21] We explained that "LaSalle's equitable subrogation claim [did] not derive from its contractually refinanced debt and accompanying lien," which were invalidated under § 50(e) and (a)(6)(I), but rather "from its prior discharge of constitutionally valid purchase-money and tax liens."[22] We pointed out that we previously had "honored equitable subrogation claims against homestead property when a refinance, even though unconstitutional, was used to pay off valid liens".[23] And we reiterated that subrogation helps the homeowner:

> Throughout our jurisprudence, we have stressed that the doctrine of equitable subrogation works to protect homestead property. Without equitable subrogation,

---

[19] *Id.* at 619.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* (citing *Benchmark Bank v. Crowder*, 919 S.W.2d 657 (Tex. 1996)).

8

lenders would be hesitant to refinance homestead property due to increased risk that they might be forced to forfeit their liens. The ability to refinance provides homeowners the flexibility to rearrange debt and avoid foreclosure.[24]

The constitutional provisions Zepeda relies on were enacted before *LaSalle*. None "contains . . . language that would indicate displacement of equitable common law remedies was intended," and as in *LaSalle*, "we decline to engraft such a prohibition onto the constitutional language."[25] Furthermore, since *LaSalle* was decided, § 50 has been amended twice, in 2013[26] and 2017,[27] but neither set of amendments added language addressing subrogation.

Zepeda argues that the availability of subrogation as a safety net erodes lenders' incentives to make loans that comply with all constitutional requirements and to promptly cure any defects. Freddie Mac counters that abolishing subrogation would result in a windfall to borrowers, that subrogation does not even make a lender whole because the amount of the subrogated first lien is usually less than the loan on which the borrower defaulted, and that abolishing subrogation would destabilize the Texas real-estate industry and increase the cost of borrowing money. Home-equity loans have been legal in Texas for about 24 years, but subrogation has been part of the common law

---

[24] *Id.* at 620 (citing *Benchmark Bank*, 919 S.W.2d at 661).

[25] *Id.* at 619. Zepeda argues, alternatively, that *LaSalle* is distinguishable because there was no constitutional provision in effect at that time that would have allowed a lender to cure the specific constitutional defect at issue, a home-equity loan secured by agricultural homestead property. Freddie Mac disputes that the defect in *LaSalle* could have been cured. The answer is unclear and irrelevant because, as we have explained, subrogation in the mortgage context arises from and is fixed at the time that the lender pays off a valid, prior loan on the property. *Benchmark Bank*, 919 S.W.2d at 660.

[26] Tex. S.J. Res. 18, 83rd Leg., R.S. (amending § 50(k) to authorize reverse mortgage loans on homestead property).

[27] Tex. S.J. Res. 60, 85th Leg., R.S. (amending § 50(a), (f), (g), and (t) and adding (f-1)).

for more than a century. On this historical and procedural record, we believe that revisiting the wisdom of subrogation in this case is unwarranted.

*     *     *     *     *

Under Texas law, a lender who discharges a prior, valid lien on the borrower's homestead property is entitled to subrogation, even if the lender failed to correct a curable defect in the loan documents under § 50 of the Texas Constitution. We answer the certified question "yes".

 

Nathan L. Hecht
Chief Justice

Opinion delivered: April 24, 2020