# Supreme Court of Texas

No. 21-0941

PNC Mortgage, a Division of PNC Bank, N.A. Successor to
National City Bank and National City Mortgage, a Division of
National City Bank of Indiana,

*Petitioner*,

v.

John Howard and Amy Howard,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued December 1, 2022**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

This case is before us for a second time. It is undisputed that PNC Mortgage, whose predecessor refinanced the Howards' original mortgage loans, did not initiate foreclosure proceedings until the statute of limitations had expired on a claim to enforce its own lien. The issue in the first round of appeals was whether the common-law doctrine of equitable subrogation provided PNC with an alternative means of foreclosure. The court of appeals "balance[d] the equities", including

PNC's negligence, and held that the trial court did not err by denying PNC's claim for equitable relief and rendering judgment for the Howards.[1]

While PNC's first petition for review was pending before this Court, we answered the Fifth Circuit's certified question in *Federal Home Loan Mortgage Corp. v. Zepeda*.[2] That case involved the ability of a home-equity lender to foreclose through equitable subrogation when its own lien was invalid under Article XVI, Section 50 of the Texas Constitution.[3] Relying on a line of cases dating back to 1890, we explained that in the mortgage-lending context specifically, a refinance lender's negligence in preserving its own lien plays no part in its entitlement to enforce an earlier lien through equitable subrogation.[4] Because the court of appeals' equity-balancing analysis in the first appeal of this case conflicted with our analysis in *Zepeda*, without hearing oral argument, we reversed the court of appeals' judgment and remanded with an instruction to address the Howards' claim that PNC's equitable-subrogation claim is time-barred.[5]

---

[1] *PNC Mortg. v. Howard*, 618 S.W.3d 75, 84-85 (Tex. App.—Dallas 2019) [*PNC I*], *rev'd*, 616 S.W.3d 581 (Tex. 2021). There are three prior appellate court decisions in this case, all with the same style. We will use the short forms *PNC I* and *PNC II* when citing the decisions of the court of appeals and the short form *Howard* when citing the prior decision of this Court.

[2] 601 S.W.3d 763 (Tex. 2020).

[3] *See id.* at 764-765.

[4] *See id.* at 766-767 (discussing *Tex. Land & Loan Co. v. Blalock*, 13 S.W. 12 (Tex. 1890)).

[5] *Howard*, 616 S.W.3d 581 (Tex. 2021).

On remand, the court of appeals concluded that any equitable-subrogation claim that PNC could have asserted would have accrued when PNC accelerated the Howards' note and that, therefore, this claim is time-barred too.[6] We agree and affirm.

## I

John and Amy Howard took out two mortgages with First Franklin Financial Corporation to purchase a home in 2003. Two years later, they refinanced those loans with the Bank of Indiana, using the proceeds of that loan to pay off their initial mortgages. The Bank of Indiana later assigned its note and deed of trust to PNC.

The Howards stopped paying in 2008. PNC accelerated the note in 2009, but then Amy Howard filed for bankruptcy. In early 2010, the bankruptcy court entered a consent order memorializing a new repayment schedule, but the Howards remained delinquent on the amended note.

Shortly thereafter, in the spring of 2010, the Bank of Indiana, despite having assigned its note to PNC, sent the Howards a notice of acceleration. In short order, the Bank appointed a substitute trustee to conduct a nonjudicial foreclosure sale of the Howards' property, where the property was purchased by the Bank.

The Howards immediately sued to set aside the foreclosure sale, naming both the Bank and PNC as defendants. But then the litigation stalled. Four years later, in 2014, the trial court granted the Howards'

---

[6] *PNC II*, 651 S.W.3d 154, 160 (Tex. App.—Dallas 2021).

motion for partial summary judgment against the Bank and rendered a judgment declaring the foreclosure sale void.

Only then—in January 2015—did PNC make any claim based on the Howards' failure to pay the note that PNC held. By then the four-year statute of limitations[7] had expired on PNC's claim to foreclose on its own lien. So, in both a counterclaim to the Howards' wrongful-foreclosure suit and affirmatively in a separate lawsuit, PNC asserted a claim for foreclosure on the lien held by the Howards' original lender, First Franklin, which was transferred to PNC's predecessor, the Bank, in the refinance transaction through the doctrine of equitable subrogation. The trial court consolidated the two suits, held a bench trial on facts stipulated by the parties, and rendered a judgment for the Howards that PNC take nothing. A ping pong of appellate proceedings followed. The question in this most recent round is when any claim by PNC to enforce the lien acquired through subrogation would have accrued. The answer turns on how subrogation operates in the mortgage-lending context.

## II

"Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant."[8] The right of

---

[7] *See* TEX. CIV. PRAC. & REM. CODE § 16.035(a) ("A person must bring suit for the recovery of real property under a real property lien or the foreclosure of a real property lien not later than four years after the day the cause of action accrues.").

[8] *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting 1 DOBBS, LAW OF REMEDIES § 4.3(4), at 604 (2d ed. 1993)); *see also Zepeda*, 601

substitution arises "because, for some justifiable reason, the subrogation plaintiff has paid a debt owed by the defendant."[9] We see subrogation most often in an insurance context, but it "applies 'in every instance in which one person . . . has paid a debt for which another was primarily liable'".[10]

Sometimes the right of substitution "arises by contract",[11] sometimes it is provided for by statute,[12] and sometimes it "arises by operation of law or by implication in equity".[13] In the third case, equitable factors such as negligence or knowledge are sometimes relevant to a party's entitlement to a remedy through subrogation.[14] Yet sometimes equitable factors play no role at all in the application of the

S.W.3d at 765 n.3.

[9] *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting 1 DOBBS, *supra* note 8, § 4.3(4), at 604).

[10] *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008) (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007)).

[11] *Zepeda*, 601 S.W.3d at 765 n.3 (quoting *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

[12] *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007) ("The three varieties of subrogation—equitable, contractual, and statutory—represent three separate and distinct rights that, while related, are independent of each other."); *Guillot v. Hix*, 838 S.W.2d 230, 231 (Tex. 1992) (observing that under the Workers' Compensation Act, "[w]hen a claim for workers' compensation is made, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the person who caused the injury").

[13] *Zepeda*, 601 S.W.3d at 765 n.3 (quoting *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

[14] *See id.* at 767 n.17 (noting the role of equitable principles in the lien-priority context and some insurance contexts).

doctrine we call equitable subrogation.[15] Because subrogation is something of a shapeshifter, courts and litigants should use caution before relying on language about subrogation that appears in a different kind of case.[16]

## A

What the substituted party obtains through subrogation depends on the context.[17] Subrogation can give an insurance carrier or another party standing to assert a *damages claim* that initially belonged to a tort victim.[18] By contrast, in the mortgage-lending context, what subrogation gives a refinance lender is merely a *back-up lien*.[19] This distinction has

---

[15] *See Howard*, 616 S.W.3d at 584 ("A lender's negligence in preserving its rights under its own lien . . . does not deprive the lender of its rights in equity to assert an earlier lien that was discharged using proceeds from the later loan." (citing *Zepeda*, 601 S.W.3d at 766)).

[16] To promote clarity in legal arguments and opinions, we also encourage courts and litigants to avoid the terms *subrogor* and *subrogee*, which are used in many of our past cases. The subrogor is the original creditor— "[s]omeone who allows another to be substituted for oneself" or "who transfers a legal right to collect a claim to another in return for payment". *Subrogor*, BLACK'S LAW DICTIONARY (11th ed. 2019). The subrogee is the transferee and new creditor or plaintiff—"[s]omeone who is substituted for another in having a right, duty, or claim". *Subrogee*, BLACK'S LAW DICTIONARY (11th ed. 2019). But the terms are easy to mix up, and their use could cause mischief.

[17] *See Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019) (stating that subrogation "entitl[es] the paying party to rights, remedies, or securities that would otherwise belong to" another).

[18] *See Frymire*, 259 S.W.3d at 147 (holding that under the doctrine of equitable subrogation, an HVAC subcontractor who indemnified a hotel owner for property damage caused by a faulty valve had standing to assert product-liability claims against the valve's manufacturer).

[19] In *LaSalle Bank National Association v. White*, we said:

6

consequences for when a claim acquired through subrogation accrues.

Take, for example, an insurer's statutory right of subrogation under the Workers' Compensation Act. Under the Act, an insurance carrier who pays benefits to an injured employee becomes "subrogated to the rights of the injured employee and may enforce the liability of the third party" by asserting the claim the injured worker could have brought.[20] In this context, "[t]here is but one cause of action against the third party tortfeasor"—the claim belonging to the employee, which is transferred to the carrier under the Act.[21] We have thus held that

> Texas has long recognized a lienholder's common law right to equitable subrogation. The doctrine allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes *and assume the lienholder's right to the security interest* against the debtor. The doctrine of equitable subrogation has been repeatedly applied *to preserve lien rights* on homestead property. If applied in this case, LaSalle's payment of the balance of the purchase-money mortgage and the accrued taxes on White's property would entitle it *to assume those lienholders' security interests* in the homestead.

246 S.W.3d 616, 618-619 (Tex. 2007) (emphases added) (citations omitted); *see also Zepeda*, 601 S.W.3d at 766 & n.13 (citing *LaSalle* for the same proposition); *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661 (Tex. 1996) ("We have previously held that a third party who refinances a debt secured by a valid mechanic's lien against a homestead may be *subrogated to the lien.*" (emphasis added)).

[20] TEX. LAB. CODE § 417.001(b); *see also Guillot*, 838 S.W.2d at 232 (explaining that "a carrier's subrogation rights under the Workers' Compensation Act" are "entirely derivative of the [injured employee's] interests").

[21] *Guillot*, 838 S.W.2d at 232 (quoting *Phennel v. Roach*, 789 S.W.2d 612, 615 (Tex. App.—Dallas 1990, writ denied)). The carrier's recovery through subrogation "is limited to the amount of the total benefits paid or assumed by the carrier to the employee . . . , less the amount by which the court reduces

"because the [insurer's] subrogation claim is derivative of the employee's rights, . . . it accrues at the same time the employee's action against the third party accrues."[22]

PNC urges us to apply a similar rule here. It argues that limitations on a refinance lender's subrogation claim should not begin to run until the maturity date of the note on the original debt that was later refinanced. This idea is supported by a few federal district court decisions.[23]

The accrual rule urged by PNC is incompatible with "the dual nature of a note and deed of trust" under Texas law, however.[24] In the

---

the judgment based on the percentage of responsibility . . . attributable to the employer." TEX. LAB. CODE § 417.001(b).

[22] *Guillot*, 838 S.W.2d at 235. In earlier cases, we had held, based on statutory language then in effect, that the carrier's subrogation claim accrued when the carrier paid the employee or when its obligation to do so was established. *See id.* at 233-234. But there were "difficult[ies] with this rule", and by the time we decided *Guillot*, the statutory language had been amended. *Id.* at 234.

[23] *See De La Cruz v. Bank of N.Y.*, No. A-17-CV-00163-SS, 2018 WL 3018179, at *6 (W.D. Tex. June 15, 2018); *Priester v. Long Beach Mortg. Co.*, No. 4:16-CV-00449, 2018 WL 1081248, at *4 (E.D. Tex. Feb. 28, 2018); *Zepeda v. Fed. Home Loan Mortg. Ass'n*, No. 4:16-CV-3121, 2018 WL 781666, at *5 (S.D. Tex. Feb. 8, 2018), *rev'd*, 967 F.3d 456 (5th Cir. 2020). These cases rely on *Gillespie v. Ocwen Loan Servicing, LLC*, 4:14-CV-00279, 2015 WL 12582796, at *4 (S.D. Tex. Oct. 28, 2015), but a close reading of *Gillespie* casts doubt on whether it supports the rule urged by PNC and adopted by these district court decisions.

[24] *Martins v. BAC Home Loans Servicing, L.P.*, 722 F.3d 249, 255 (5th Cir. 2013). The Fifth Circuit summarized Texas law as follows:

The Texas courts have repeatedly discussed the dual nature of a note and deed of trust. It is so well settled as not to be controverted that the right to recover a personal judgment for a

refinance transaction, the original note is paid. That note then ceases to exist; it no longer has a maturity date; and a new note between the borrower and the refinance lender is executed.

What equitable subrogation actually transfers to a refinance lender is the original creditor's security interest, so the refinance lender has an alternative lien if its own lien is later determined to be invalid.[25] This transfer occurs automatically, by operation of law, when the refinance lender's money is used to pay off the original creditor's loan

> debt secured by a lien on land and the right to have a foreclosure of lien are severable, and a plaintiff may elect to seek a personal judgment without foreclosing the lien, and even without a waiver of the lien. Where a debt is secured by a note, which is, in turn, secured by a lien, the lien and the note constitute separate obligations. The Texas courts have rejected the argument that a note and its security are inseparable by recognizing that the note and the deed-of-trust lien afford distinct remedies on separate obligations. A deed of trust gives the lender as well as the beneficiary the right to invoke the power of sale, even though it would not be possible for both to hold the note.

*Id.* (citations and quotation marks omitted).

[25] *See supra* note 19. In *Zepeda* and the cases on which it relied, the refinance transaction failed one of the "litany of exacting terms and conditions" in Article XVI, Section 50 of the Texas Constitution. 601 S.W.3d at 766 (citing *Garofolo v. Ocwen Loan Servicing, L.L.C.*, 497 S.W.3d 474, 477 (Tex. 2016)). A refinance lender's lien might also be invalidated by a mistake of fact occurring at the time the transaction was made. *See Kone v. Harper*, 297 S.W. 294 (Tex. Civ. App.—Waco 1927) (when refinance lender paid a note held by a prior creditor, the creditor had already sold the note and deed of trust to a third party), *aff'd*, 1 S.W.2d 857 (Tex. Comm'n App. 1928); *Hays v. Spangenberg*, 94 S.W.2d 899 (Tex. Civ. App.—Austin 1936, no writ) (debtor was determined to be mentally incompetent at the time of execution); *see also Gillespie*, 2015 WL 12582796 (one of the borrowers on the first loan did not sign the deed on the second note).

and discharge its lien.[26] In *Zepeda*, we explained the public-policy reason for this transfer and how it ultimately "protect[s] homestead property."[27]

**B**

The transfer or substitution that occurs through subrogation puts the party receiving the interest on par with the party from whom the interest was transferred. Subrogation does not put the party receiving the interest in a better position than the party from whom it was transferred.[28] This is another reason why the accrual rule urged by PNC is wrong and why the rule applied by the court of appeals is correct.[29]

A claim to foreclose on a real property lien accrues when the underlying note is accelerated.[30] If the Howards' original lender had accelerated their notes due to nonpayment, that lender would have had four years from the date of acceleration to initiate foreclosure proceedings.[31] If that lender had accelerated but then waited to foreclose until the final due date of the note, perhaps some thirty years later, its foreclosure claim would have been lost. But PNC's proposed rule could

---

[26] *See Howard*, 616 S.W.3d at 584 ("[E]quitable-subrogation rights become fixed at the time the proceeds from a later loan are used to discharge an earlier lien." (citing *Zepeda*, 601 S.W.3d at 766)).

[27] 601 S.W.3d at 768 (quoting *LaSalle*, 246 S.W.3d at 620).

[28] *Cf. Mid-Continent Ins. Co.*, 236 S.W.3d at 774 ("[T]he insurer stands in the shoes of the insured, *obtaining only those rights held by the insured against a third party*, subject to any defenses held by the third party against the insured." (emphasis added)).

[29] *See PNC II*, 651 S.W.3d at 160 ("PNC cannot, in the name of equity, have more rights than the party to which it is subrogated . . . .").

[30] *See id.* at 156 (collecting cases).

[31] *See* TEX. CIV. PRAC. & REM. CODE § 16.035(a).

give a refinance lender—just by virtue of being the second lender in time—not only four years from the date of acceleration to foreclose on its own lien but then an additional period, perhaps decades, to foreclose on the lien it acquired through subrogation.[32]

Like the original lender, a refinance lender has only one foreclosure claim, which accrues when the note made in the refinancing transaction is accelerated. If the lien created by the refinance transaction turns out to be invalid, then equitable subrogation substitutes the remedy of foreclosing on the original creditor's lien instead.[33] Subrogation provides the refinance lender with an alternative remedy, not an additional claim.[34] The court of appeals thus correctly

---

[32] Though perhaps unlikely in the modern era of thirty-year mortgages, if an original note with a short term is refinanced into a longer-term note, under PNC's proposed rule, the refinance lender could lose any right to foreclose through subrogation before the borrower defaults on the refinanced note. PNC's rule would thus produce arbitrary results that could negatively impact the ability of some borrowers to refinance for a reason having nothing to do with the borrower's creditworthiness—the remaining term on the original note at the time of refinancing.

[33] *See LaSalle*, 246 S.W.3d at 619 ("By definition, equitable remedies apply only when there is no remedy at law . . . ."); *Kone*, 297 S.W. at 300 ("The question is, not whether the right to subrogation is barred, for such right arises, if at all, as a matter of law . . . ."); *see also Mid-Continent Ins. Co.*, 236 S.W.3d at 774 ("Having a right to subrogation, however, is distinct from the ability to recover under that right.").

[34] PNC's argument that equitable tolling operated to defer the accrual of its subrogation claim until after its claim to foreclose on its own lien became time-barred fails for this reason. PNC cites *Hughes v. Mahaney & Higgins*, where we held that "when an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted." 821 S.W.2d 154, 157 (Tex. 1991). *Hughes* involved two distinct lawsuits: one for adoption and a second for the lawyer's

held that any claim PNC would have had through subrogation to foreclose on the original lender's lien would have accrued in June 2009, when the Howards' refinanced loan was accelerated.[35] Because PNC did not initiate foreclosure within four years of that date,[36] its claim is time-barred.[37]

*    *    *    *    *

We affirm the judgment of the court of appeals.

_____

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** May 12, 2023

---

malpractice in the adoption case. This case involves only a single claim for foreclosure.

[35] *PNC II*, 651 S.W.3d at 159-160; *see also Hays*, 94 S.W.2d at 902 ("Nor do we think limitation began to run against Spangenberg's [subrogation] rights until the due date of the note executed *to him*." (emphasis added)).

PNC asserts in its briefing that it abandoned the June 2009 acceleration during Amy Howard's bankruptcy proceeding. But this case was tried on stipulated facts, and one says: "The Parties agree the Note was properly accelerated on June 19, 2009." There is no mention of abandonment, and PNC has not offered an alternative acceleration date. And based on the parties' stipulation to the June 2009 acceleration date, PNC conceded in the trial court that its claim to foreclose on its own lien was time-barred.

[36] TEX. CIV. PRAC. & REM. CODE § 16.035(a).

[37] PNC argues that our prior decision in this case demands a holding that its claim is not time-barred. *Howard*, however, addressed whether a lender's negligence bars equitable subrogation in the first place, *see* 616 S.W.3d at 584-585, not the date a lender's foreclosure claim accrues.