# Supreme Court of Texas

No. 24-1057

Janice C. Staub and Parker D. Young,

*Petitioners,*

v.

BBVA USA,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued February 10, 2026**

JUSTICE BLAND delivered the opinion of the Court.

The Texas Constitution protects homeowners from foreclosure of their homesteads with a few exceptions.[1] One exception permits homeowners to secure a home equity loan made according to Article XVI, Section 50(a)(6).[2] Consistent with the Constitution's protections,

---

[1] *See* Tex. Const. art. XVI, § 50.

[2] *Id.* § 50(a)(6).

however, a lender who breaches the loan agreement may forfeit the amount it loaned in certain circumstances.[3]

In this case, a lender overcharged about $10,000 in interest on a line of credit totaling about $700,000. The lender eventually admitted its error and tendered the amount it overcharged plus interest to satisfy the borrower's actual damages. The borrower, however, sued to keep the entire loan amount, invoking the Constitution's forfeiture remedy found in Article XVI, Section 50(a)(6)(Q)(x). We must decide whether a borrower may invoke this remedy for any lender breach of a home equity loan agreement or only for breaches of constitutionally mandated conditions.

We hold that the forfeiture remedy corresponds to the lender's constitutional obligations. Section 50(a)(6) lists home equity loan terms and conditions so fundamental to the protection of a homestead as to be constitutionally enshrined.[4] Lenders must comply with these terms and conditions or risk forfeiture of the loan amount. Forfeiture of the loan amount, however, is not a remedy for every lender breach of a home equity loan agreement. The trial court and the court of appeals reached the same conclusion. Accordingly, we affirm.

---

[3] *Id.* § 50(a)(6)(Q)(x).

[4] *See id.* § 50(a)(6)(A)–(Q).

## I

In early 2018, BBVA USA[5] offered Parker Young[6] a home equity line of credit with a promotional interest rate at 0.26% lower than the Wall Street Journal prime rate. To qualify, a borrower had to draw on the line of credit and hold a $25,000 loan balance on the fifteenth day after closing. Important to this case, the loan balance requirement did not apply to a loan secured by a Texas homestead.

In May 2018, Young obtained a loan under the promotion, secured by his Texas homestead. As the Texas Constitution requires, the agreement states that BBVA forfeits the loan amount should it "fail to comply with [its] obligations under the extension of credit and fail to correct the failure to comply not later than the 60th day after the date [the borrower] notifies [BBVA] of [its] failure to comply," "but only to the extent required by Section 50(a)(6), Article XVI, Texas Constitution." Young drew his first advance in October 2018, more than fifteen days after the loan closed.

In late 2020, Young discovered BBVA had charged him approximately 0.01% below the prime interest rate instead of the agreed 0.26%. On December 2, 2020, Young called BBVA to notify it of its billing error. On January 29, 2021, BBVA emailed Young denying any error and contending Young did not qualify for the lower interest rate because he had not drawn advances totaling $25,000 in the fifteen days following closing.

---

[5] BBVA acquired Compass Bank after Compass made the loan.

[6] Young is the sole borrower. He co-owns the homestead with his spouse, Janice Staub.

In February, Young alerted BBVA that the qualification it relied on to deny his interest claim did not apply to a loan secured by a Texas residence. BBVA did not respond. In total, Young had paid BBVA about $253,000 and owed about $448,000 on the outstanding line of credit. BBVA had overcharged him about $10,000 in interest.

After sixty days passed from the date of Young's first call to BBVA, Young sued BBVA for breach of contract, seeking forfeiture of the loan amount and interest thereon or, alternatively, actual damages. Finally recognizing its error in charging approximately 0.25% more in interest than agreed upon, BBVA sought to settle the contract claim. It quickly became apparent that the parties disagreed as to whether BBVA also must forfeit the loan amount and interest, having failed to cure its error within sixty days. Young estimated his damages at over $600,000; BBVA estimated the damages at about $9,500 plus Young's attorney's fees. Young amended his petition to seek a declaratory judgment that BBVA must forfeit the loan amount and interest due to its breach of the interest rate provision.

The parties moved for summary judgment. The trial court granted BBVA's motion, ruling that Young is not entitled to constitutional forfeiture. BBVA paid Young $12,630.32, representing his actual damages plus interest. To facilitate entry of a final judgment, the parties stipulated that Young prevailed on his claim for breach of contract and BBVA prevailed on the forfeiture claim. Young appealed.

The court of appeals affirmed, holding that forfeiture is a remedy for the breach of obligations found within the Texas Constitution, not

4

obligations arising under contract or other law.[7] The court of appeals relied on our decision in *Garofolo v. Ocwen Loan Servicing, L.L.C.*,[8] in which we held forfeiture is available only if constitutional corrective measures cure the lender's breach.[9]

## II

Young contends Section 50(a)(6)(Q)(x)'s language—providing for forfeiture "if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit"[10]—extends beyond constitutional obligations and applies to every provision of a home equity loan agreement. "[O]bligations under the extension of credit," in his view, encompasses the universe of potential lender obligations held in extending a home equity loan.

BBVA responds that "obligations" refers to the terms and conditions found within Section 50. Young's reading, in BBVA's view, impermissibly isolates the disputed phrase from its textual context. The phrase appears throughout the section to refer to a lender's constitutional obligations,[11] and the Constitution does not incorporate the universe of contractual provisions by oblique reference. Further, the Constitution lists available corrective measures.[12] That none of these corrective measures cures an interest-rate billing error is another

---

[7] 726 S.W.3d 506, 513–15 (Tex. App.—Dallas 2024).

[8] 497 S.W.3d 474 (Tex. 2016).

[9] *Id.* at 484; *see* 726 S.W.3d at 512–14.

[10] Tex. Const. art XVI, § 50(a)(6)(Q)(x).

[11] *See id.* § 50.

[12] *Id.* § 50(a)(6)(Q)(x)(a)–(f).

textual indication that the forfeiture remedy does not apply to garden-variety contract claims. Finally, both the historical context for the adoption of the home equity constitutional provision and our precedent are consistent with a textual reading that the forfeiture remedy corresponds to the Constitution's required terms.

To resolve whether forfeiture is available to Young for BBVA's breach, we examine the meaning of "the lender's or holder's obligations under the extension of credit" found in Article XVI, Section 50(a)(6)(Q)(x).[13]

## A

In 1997, Texas became the last state to permit home equity loans.[14] Voters amended the Texas Constitution to add Article XVI, Section 50(a)(6),[15] which sets forth the terms and conditions a home equity lender must satisfy to create a valid homestead lien.[16] Among them, a home equity loan must include the forfeiture remedy found in Section 50(a)(6)(Q)(x):

> [E]xcept as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the

---

[13] *Id.* § 50(a)(6)(Q)(x). In reviewing cross-motions for summary judgment, we consider evidence from both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Thompson v. Landry*, 713 S.W.3d 372, 376 (Tex. 2025). We review rulings on motions for summary judgment de novo. *Id.*

[14] *Fin. Comm'n v. Norwood*, 418 S.W.3d 566, 571 (Tex. 2013).

[15] *See Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 343 (Tex. 2001) (discussing the addition of Article XVI, Section 50(a)(6) to the Texas Constitution).

[16] *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 356 (Tex. 2000) (citing Tex. Const. art XVI, § 50(a)(6)).

extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply . . . .[17]

The provision lists six methods to cure a failure to comply and avoid forfeiture.[18] One such cure is offering to refinance the loan coupled with a lump-sum payment to the borrower.[19] The voters added these curative measures in 2003.[20] The original provision did not include specific corrective measures and required a breach to be corrected "within a reasonable time" rather than the current sixty days.[21]

## B

"[W]hen interpreting our state constitution, we rely heavily on its literal text and give effect to its plain language."[22] "We construe constitutional provisions and amendments [relating] to the same subject matter together and consider those amendments and provisions in light

---

[17] Tex. Const. art. XVI, § 50(a)(6)(Q)(x).

[18] *Id.* § 50(a)(6)(Q)(x)(a)–(f).

[19] *Id.* § 50(a)(6)(Q)(x)(f).

[20] *See Garofolo*, 497 S.W.3d at 483.

[21] *Id.* (quoting Tex. Const. art XVI, § 50(a)(6)(Q)(x) (amended 2003)).

[22] *Id.* at 477.

of each other."[23] We thus read Section 50(a)(6)'s provisions together as a whole.[24]

Considering the entirety of Section 50(a)(6), the phrase "obligations under the extension of credit" refers to the obligations stated as terms and conditions found within the same section. The first indication is the section's structure. Section 50(a)(6) outlines the terms and conditions a home equity loan must include for a lender to have the option of a forced sale upon a borrower's default.[25] In that context, the term "obligations" is naturally read to refer to the very terms and conditions found within the subsection.

Young presses that the provision imposes the remedy for breach of terms found both inside and outside the subsection because the phrase does not explicitly confine its reach to constitutional obligations. To read the phrase in such isolation is to read it in error. A reference to "the extension of credit," without more, does not import an outside document or obligation into the Constitution. Rather, it is those constitutional obligations that a lender must import *into* the loan agreement.

The remainder of Section 50, where numerous provisions refer to Section 50(a)(6) to describe a particular kind of "extension of credit," demonstrates that the pertinent obligations are those enumerated in the

---

[23] *Doody*, 49 S.W.3d at 344.

[24] *See id.* at 345 (interpreting the entirety of Tex. Const. art. XVI, § 50(a)(6) as "relate[d] to the same subject matter").

[25] Tex. Const. art. XVI, § 50(a)(6).

Constitution itself.[26] For example, Section 50(f)(1) states that a refinance of debt secured by the homestead may be "an extension of credit described by Subsection (a)(6)." Likewise, Section 50(g) refers to "[a]n extension of credit described by Subsection (a)(6) of this section." Section 50(h)(1) discusses requirements "applicable to an extension of credit under Subsection (a)(6)." The phrase "lender's and holder's obligations under the extension of credit" is best understood as a reference to the "extension of credit" Section 50(a)(6) describes and its enumerated terms and conditions.

Young relies on our answer to a certified question in *Sims v. Carrington Mortgage Services, L.L.C.*[27] to contend that Section 50(a)(6)(Q)(x) applies to all provisions of a loan agreement. In *Sims*, we clarified what qualifies as a new "extension of credit."[28] We were not asked in that case, however, to determine the reach of "obligations under the extension of credit" found in Section 50(a)(6)(Q)(x) or its corresponding forfeiture remedy.[29]

The Constitution's curative measures further support the reading that "obligations under the extension of credit" refers to constitutional terms and conditions. As we held in *Garofolo*, "forfeiture is available only if one of the six specific constitutional corrective measures would

---

[26] *See id.* § 50; *see also id.* § 50(a) ("The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for . . . (6) an *extension of credit . . . .*" (emphasis added)).

[27] 440 S.W.3d 10 (Tex. 2014).

[28] *Id.* at 16–17.

[29] *See id.* at 13 (reciting questions certified).

9

actually correct the lender's failure to comply with its obligations under the terms of the loan."[30] The six curative measures address only breaches of constitutional obligations.[31] The first five provide remedies for violations of identified terms and conditions.[32] Though Young attempts to paint the refinancing cure in Section 50(a)(6)(Q)(x)(f) as a "catch-all" for every remaining breach (including those outside the Constitution), the language expressly limits its applicability to constitutional breaches.[33] The provision contains the phrase "with any modifications necessary to comply *with this section,*" explicitly confining

---

[30] 497 S.W.3d at 484.

[31] *See* Tex. Const. art. XVI, § 50(a)(6)(Q)(x)(a)–(f).

[32] *See id.* § 50(a)(6)(Q)(x)(a) ("paying to the owner an amount equal to any overcharge . . . if the owner has paid an amount that exceeds an amount stated in the applicable *Paragraph (E), (G), or (O) of this subdivision*" (emphasis added)); *id.* § 50(a)(6)(Q)(x)(b) ("sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by *Paragraph (B) of this subdivision*, if applicable, or is not secured by property described under *Paragraph (H) of this subdivision*" (emphases added)); *id.* § 50(a)(6)(Q)(x)(c) ("sending the owner a written notice modifying *any other amount, percentage, term, or other provision prohibited by this section*" (emphasis added)); *id.* § 50(a)(6)(Q)(x)(d) ("delivering the required documents to the borrower if the lender fails to comply with *Subparagraph (v) of this paragraph* or obtaining the appropriate signatures if the lender fails to comply with *Subparagraph (ix) of this paragraph*" (emphases added)); *id.* § 50(a)(6)(Q)(x)(e) ("sending the owner a written acknowledgement, if the failure to comply is prohibited by *Paragraph (K) of this subdivision*, that the accrual of interest and all of the owner's obligations under the extension of credit are abated" (emphasis added)).

[33] *See id.* § 50(a)(6)(Q)(x)(f).

the (f) refinancing cure to the constitutional obligations found in Section 50, just like the other curative measures.[34]

The provision's language thus definitively limits the (f) refinancing cure to constitutional breaches. Even if it did not, the canon of *ejusdem generis* shows the "general words" in (f), following the "designation of particular subjects" in (a)–(e), are "restricted by the particular designation."[35] The first five measures target constitutional terms and conditions; the refinancing cure in (f) must similarly be read as applying to "failure[s] to comply" with *constitutional* obligations that "cannot be cured under Subparagraphs (x)(a)–(e)."[36] The (f) refinancing cure is not available to correct BBVA's billing error.

Young counters that post-origination breaches of constitutional terms are rare and thus the refinancing cure in (f) is largely unnecessary absent an expansive reading of the forfeiture remedy. We disagree. For example, Section 50(a)(6)(M)(i) requires a twelve-day cooling off period between application and closing.[37] The refinancing cure in (f) provides a breaching lender the ability to start over with the loan and comply with the twelve-day cooling off period.[38] The (f) cure may correct few constitutional deficiencies, but, as we noted in *Garofolo*, it "cannot apply

---

[34] *Id.* (emphasis added).

[35] *See City of San Antonio v. Realme*, 731 S.W.3d 342, 350 (Tex. 2026) (quoting *Farmers' & Mechs.' Nat'l Bank v. Hanks*, 137 S.W. 1120, 1124 (Tex. 1911)).

[36] Tex. Const. art. XVI, § 50(a)(6)(Q)(x)(f).

[37] *Id.* § 50(a)(6)(M)(i).

[38] *Id.* § 50(a)(6)(Q)(x)(f).

11

to *every* deficiency not addressed by the other five corrective measures."[39]

Finally, Young asserts that the constitutionally required written notice[40] would mislead buyers if the Section 50(a)(6)(Q)(x) forfeiture remedy is not expanded to every contractual obligation found outside the Constitution. We disagree with this assertion for two reasons. First, the notice expressly refers to Section 50(a)(6)(Q)(x), effectively alerting the borrower to the constitutional obligations that correspond to the forfeiture remedy.[41] Second, the notice explicitly states that it is a summary of the borrower's constitutional rights under Section 50, Article XVI, making it clear that the language in the constitutional provision controls.[42]

For these reasons, we hold that Section 50(a)(6)'s "obligations under the extension of credit" refers to the enumerated terms and conditions found within Section 50(a)(6)'s text.

## C

"The Texas Constitution derives its force from the people of Texas."[43] It is "the fundamental law under which the people of this state have consented to be governed."[44] In interpreting this fundamental law,

---

[39] 497 S.W.3d at 483.

[40] *See* Tex. Const. art. XVI, § 50(g) (providing the written notice that a lender must give a borrower at least twelve days before closing).

[41] *Id.*

[42] *Id.*

[43] *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989).

[44] *Id.*

"'[o]ur guiding principle . . . is to give effect to the intent of the voters who adopted it,' which requires sensitivity to the full context of the constitutional language and history."[45] In doing so, "we may consider evidence of the contemporaneous explanations and understandings of the legislature that proposed the language and the electorate that voted on its ratification."[46] "Ultimately, our 'bottom-line task is to identify what'" a given constitutional phrase "would have meant to those who ratified it."[47] Evidence of contemporaneous explanations and understandings will "yield when the text's plain meaning says the opposite," but otherwise "may shed helpful light on what the text meant to those who ratified the amendment."[48]

Texas has had a constitutional provision exempting homesteads from forced sale since the Constitution of 1845.[49] In 1986, however, Congress eliminated the federal tax deduction for consumer interest while making interest on home equity loans tax deductible.[50] And in

---

[45] *In re Dallas County*, 697 S.W.3d 142, 158 (Tex. 2024) (citation omitted) (quoting *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309, 313 (Tex. 2020)).

[46] *Perez v. City of San Antonio*, 715 S.W.3d 709, 716–17 (Tex. 2025).

[47] *Id.* at 715 (quoting *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857 (Tex. 2024)).

[48] *Id.* at 716–17 (quoting *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 467 (Tex. 2011)).

[49] *See* George D. Braden et al., The Constitution of the State of Texas: An Annotated and Comparative Analysis 788 (1977).

[50] *See* Julia Patterson Forrester, *Home Equity Loans in Texas: Maintaining the Texas Tradition of Homestead Protection*, 55 SMU L. Rev. 157, 159–60 (2002).

1994, the Fifth Circuit held that federal regulations preempted portions of Texas's homestead provisions in *First Gibraltar Bank, FSB v. Morales.*[51] Events of the time had propelled Article XVI, Section 50 into the public spotlight.

In 1995, the Texas Senate proposed a constitutional amendment to permit home equity loans; the House did not concur.[52] Jerry Patterson, a state senator who sponsored the 1995 resolution,[53] penned an essay advocating for a constitutional amendment.[54] Senator Patterson pointed out that "Texas is the only state in the nation that prohibits homeowners from using their home equity as they see fit—to educate their children, to start or expand small businesses, or to enjoy their retirement years," and he characterized access to home equity as a "basic property right."[55] Political momentum for an amendment

---

[51] 19 F.3d 1032, 1052 (5th Cir. 1994), *vacated*, 42 F.3d 895 (5th Cir. 1995). A United States Representative from Texas quickly attached an amendment to relevant federal legislation, ultimately causing the Fifth Circuit to vacate its opinion. *See* James L. Baker, *The Texas Homestead Exemption's Near Ban on Home Equity Lending: It's Time for the People to Decide*, 33 Hou. L. Rev. 239, 241–42, 242 n.17 (1996) (citing *First Gibraltar Bank*, 42 F.3d at 896–97).

[52] *See* Baker, *supra* note 51, at 242, 272.

[53] *See id.* at 272 n.193.

[54] Jerry Patterson, *Home Equity Reform in Texas*, 26 St. Mary's L.J. 323, 337 (1995).

[55] *Id.* at 324.

reached fruition in 1997, when the Legislature passed a resolution to place an amendment on the ballot.[56] The voters approved it.[57]

The proposed amendment, House Joint Resolution 31, included the forfeiture remedy.[58] The drafters envisioned the remedy as dedicated solely to ensuring constitutional compliance. For example, one bill analysis describes the provision that became Section 50(a)(6)(Q)(x) as providing "a penalty of forfeiture of principal and interest . . . if the lender or holder of an equity loan fails to comply with *this section of the Constitution* within a reasonable time after receiving notice of its failure to comply."[59]

In the lead-up to the election, lenders engaged in a statewide campaign, with brochures at teller windows and fliers touting the

---

[56] *See* Forrester, *supra* note 50, at 160.

[57] *Id.*

[58] Tex. H.J. Res. 31, 75th Leg., R.S., § 1, sec. 50(a)(6)(Q)(x), 1997 Tex. Gen. Laws 6739. 6741.

[59] House Comm. on Fin. Inst., Bill Analysis, Tex. H.J. Res. 31, 75th Leg., R.S. (1997) (emphasis added). A bill analysis accompanying the unamended House committee report on the resolution that would become the 2003 amendment similarly describes the curative measures as corresponding to a lender's constitutional obligations:

> S.J.R. 42 establishes a specific series of provisions through which a lender may cure most failures to comply with the lender's *obligations under the home equity provisions of the Constitution.* The lender shall forfeit all principal and interest of a home equity loan if the lender fails to correct its failure to comply within 60 days of being notified . . . .

House Comm. on Fin. Inst., Bill Analysis, Tex. S.J. Res. 42, 78th Leg., R.S. (2003) (emphasis added).

benefits to home equity lending.[60] The *Houston Chronicle* ran an election day column endorsing the amendment, emphasizing the lower interest rates available for home equity loans compared to other consumer debt and that such interest is tax deductible.[61] The amendment appeared on the ballot as Proposition 8: "The amendment to the Texas Constitution expanding the types of liens for home equity loans that a lender, with the homeowner's consent, may place against a homestead."[62]

Proponents advertised the consumer protections found within the amendment as addressing "fears that some Texans would lose their homes if they default" on home equity loans.[63] The publicly available House Research Organization analysis of the proposed amendment explained that the forfeiture remedy is aimed at enforcing constitutional obligations: "Lenders or holders of equity loans would forfeit all principal and interest of the loan . . . if the lender failed to comply with any of the requirements of HJR 31 within a reasonable time of receiving notice of the failure to comply."[64] The voters adopted the amendments

---

[60] *See* John W. Gonzalez, *Houston area seen as key home-equity battleground*, Hou. Chron., Nov. 2, 1997, at 1; Bruce Hight, *Banks revving up for equity loans – Lenders want flying start on paperwork if constitutional amendment passes*, Aus. Am.-Statesman, Oct. 19, 1997, at A1.

[61] Jim Barlow, *Give homeowner a break on loans*, Hou. Chron., Nov. 4, 1997, at 1.

[62] Tex. H.J. Res. 31, 75th Leg., R.S., § 3, 1997 Tex. Gen. Laws 6739, 6746.

[63] John W. Gonzalez, *1997 Voter's Guide – Amendments address home equity, crime victims, college students*, Hou. Chron., Oct. 26, 1997, at 4.

[64] House Rsch. Org., Bill Analysis, Tex. H.J. Res. 31, 75th Leg., R.S. (1997).

against the backdrop of longstanding Texas policies favoring freedom of contract and disfavoring forfeiture.[65]

"We read the constitutional text not in a vacuum but also through the lenses of history and precedent."[66] Our reading comports with the amendment's legal and historical context in 1997, the year Texas adopted Section 50(a)(6).[67] Interpreting "obligations under the extension of credit" as directly corresponding to Section 50's terms and conditions gives effect to both the text and the intent of the drafters and ratifiers of the 1997 amendment.

## D

Such an interpretation is further consistent with our precedent addressing the forfeiture remedy. In *Garofolo*, our most recent case, we held that Section 50(a)(6)'s terms and conditions do not "amount to substantive constitutional rights and obligations."[68] Importantly, we recognized that "[a] post-origination breach *of those terms and conditions* may give rise to a breach-of-contract claim for which forfeiture can sometimes be an appropriate remedy."[69] The Court's

---

[65] *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008) ("This Court has long recognized Texas' strong public policy in favor of preserving the freedom of contract."); *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) ("Forfeitures are not favored in Texas, and contracts are construed to avoid them.").

[66] *Borgelt v. Aus. Firefighters Ass'n, IAFF Local 975*, 692 S.W.3d 288, 299 (Tex. 2024).

[67] *Norwood*, 418 S.W.3d at 571; *Doody*, 49 S.W.3d at 343.

[68] 497 S.W.3d at 478.

[69] *Id.* at 475 (emphasis added). The dissent similarly concluded that the (f) remedy "applies whenever the other corrective measures would not cure the

framing reflects that Section 50(a)(6)(Q)(x) refers to the remedy as available for constitutional breaches.

*Garofolo*'s description of the remedy as "arguably open-ended"[70] does not support Young's contention that it reaches outside the Constitution. Subsections (A)–(Q) include numerous detailed requirements a loan must satisfy.[71] Many contain their own subsections (and, in several instances, sub-subsections).[72] A remedy that potentially applies to a breach of any one of them *is* "arguably open-ended." As a result, we noted in *Garofolo* that the new curative measures "clarif[ied]—and limit[ed]—the forfeiture remedy" to those constitutional obligations an enumerated cure could correct.[73]

Our earlier precedent points in the same direction. In *LaSalle Bank National Ass'n v. White*,[74] we observed: "When a home-equity loan *violates the terms of section 50(a)(6)*, section 50(a)(6)(Q)(x) provides that the lender forfeits the principal and interest . . . ."[75] Similarly, in *Wood v. HSBC Bank USA, N.A.*,[76] issued the same day as *Garofolo*, we observed that one condition for securing a home equity loan is that the

---

holder's *failure to comply with one or more of its constitutionally authorized obligations.*" *Id.* at 487 (Boyd, J., dissenting) (emphasis added).

[70] *Id.* at 483.

[71] Tex. Const. art. XVI, § 50(a)(6)(A)–(Q).

[72] *Id.*

[73] 497 S.W.3d at 483.

[74] 246 S.W.3d 616 (Tex. 2007).

[75] *Id.* at 618 n.3 (emphasis added).

[76] 505 S.W.3d 542 (Tex. 2016).

18

loan be "made on the condition that forfeiture of all principal and interest is available if the loan is *constitutionally noncompliant . . . .*"[77] Both opinions echo the common-sense understanding that Section 50(a)(6)(Q)(x) defines "obligations under the extension of credit" to be those Section 50(a)(6) requires. In the nearly three decades since the amendment was adopted, our cases reflect a common interpretation that the forfeiture remedy applies exclusively to constitutional violations. Either an expansive remedy has sat dormant for twenty-seven years, with available forfeitures flying below the radar, or lender billing errors are rare. Neither is as likely as the plain text confirming what the voting public was told about the forfeiture remedy: it applies to breaches of constitutional obligations.

\* \* \*

---

[77] *Id.* at 545 (emphasis added); *see also Stringer*, 23 S.W.3d at 356–57 ("Section 50(a)(6) also provides that the lender forfeits all principal and interest of the loan if it fails to comply with the obligations set out in section 50(a)(6).").

We hold that the forfeiture remedy applies to breaches of constitutional obligations. As Young does not assert a violation of a constitutional obligation, the trial court and court of appeals correctly rejected his claim that BBVA forfeit the entire loan amount. We affirm the judgment of the court of appeals.

Jane N. Bland
Justice

**OPINION DELIVERED:** May 29, 2026